All right, here he is. The second district is now open. The Honorable Justice Robert McLaren preside. Please be seated. Next case is number 2175. The state of Hawaii versus Maurice E Simmons. Arguing for repellent is Sheriff Silver. Arguing for the ability is Jay Hock. Ms. Silver? Good morning, Your Honors Counselor. Good morning. You may proceed. Thank you. May it please the Court, my name is Sherry Silver and I represent Maurice Simmons in this appeal. If Your Honors would indulge me, I'd like to start this morning by addressing the reasonable doubt issue. I know we probably want to get to the Batson, but I'd like to address the reasonable doubt very briefly. To start, just to go over who the players in this drama are, obviously the client here is Maurice Simmons. He is the driver of a gold vehicle on August 5, 2010. His co-defendant, whose case was severed from his, was Derek Newbern. He is the passenger in the front seat of the gold car. We contend he is also the shooter. The alleged victim was a gentleman named Darius Foster. Foster was walking up Central Avenue toward Sherman in Rockford with his then-girlfriend, Renisha Joyner. Joyner happened to be the previous girlfriend of the defendant and is the mother of two of his children. The other two witnesses that are important here are Tarsha Franklin and William Spack. Tarsha Franklin was a resident of a house at the northeast corner of Central and Sherman, kitty corner to Andrews Park where the shooting took place. William Spack was the resident of a house directly across the street at the northwest corner of Central and Sherman. Very briefly, again, hopefully briefly, what happened was Maurice and Newbern were out driving around. They were heading toward McDonald's on North Central Avenue in Rockford. Counsel, if I could interrupt, please. I think we're probably familiar with the facts. I have a question with regard to the issue of accountability. Sure. Why isn't the defendant at least accountable since when the initial shot was fired, even assuming he didn't know there was a gun, he didn't back up, turn around, go the other way. He actually circled the park probably before the shooting started but watching for Foster or at least spotted him. So maybe one could even assume that Foster was being stalked by the defendant and Newbern. He really didn't report it to the police. But what he did was continue to drive so that there was an opportunity for more shots to be fired. Isn't that enough to find him accountable? No, for the following reasons. First, I beg to differ with Your Honor. There was some factual, I believe, inaccuracies in what Your Honor just said. First, I think it's pretty much speculation to say that they were on the lookout for Foster. There's really no evidence of that. There was no evidence that came in that there was any bad blood between Maurice and Foster. Both Joyner and Maurice testified that they were perfectly content in the relationships that they were in at the time of the shooting. So there was no reason for him to be jealous or anything else of Foster dating Joyner. That would have been the only reason for him to be, as you said, stalking Foster. There was also no evidence that Newbern had any bad blood between himself and Foster. So there was no reason to think, and it is speculation, to conclude that they were looking for Foster. In fact, when they drove around the park, the first thing they did was ogle some girls that were in the park. If they weren't looking for them, was there any evidence of record to establish that this was a spontaneous combustion-type event and that it just happened as opposed to apparently from what I read was not so spontaneous? I think it's a reasonable conclusion that this was a spontaneous event. They were driving around. They happened to ogle the girls in the park. They stopped and talked to some guys at the basketball courts, and then they were going to continue on to McDonald's. At that point, when they were at the stop sign, is when Foster approached the car. They did not go looking for him. Foster and Joyner happened to be walking along the park. Foster then approached, yelling and swearing at Newbern, and that's when all heck broke loose and guns were drawn and shots were fired. So it was spontaneous. And, in fact, you could even argue that, depending on which testimony of Joyner you're going to believe, it could be that Foster pulled his gun first or it could be that Newbern pulled his gun first. If it was Foster that pulled it first, we've got an almost self-defense action here, for which that clearly would be spontaneous combustion, in Your Honor's face. So, yes, I think there is plenty of evidence to show that this was not a planned event, and in that respect it's very similar to Torrey Taylor's case. Now, Torrey Taylor was the driver of a car. His front passenger was Hollingshead. Hollingshead even showed Taylor that he had a gun in his possession. So Taylor knew that there was a gun in the car. They had this spontaneous event, a traffic altercation. Hollingshead pulls out his gun and starts shooting. And in terms of the time in between the first and second shots, even if, in our case, if the first shots Newbern fired were unknown to Maurice, the time element, as in Taylor, the minute time period that it took in between shots, was insufficient for Maurice to form the intent to aid a vessel, as it agreed. Your argument is that no reasonable juror could have found the defendant guilty beyond a reasonable doubt. Yes. That is the argument. And the law permits a jury to infer from the defendant's behavior after a post-occurrence that he intended at the time to commit a wrongful or a criminal act, correct? That is true, but I also point to Taylor again. I've read Taylor. Right. The facts are different than Taylor. I think they're pretty, it's pretty parallel. In Taylor, did the driver of the vehicle follow or continue to pursue or provide another opportunity for a shooting? Well, there were two shots. I can't remember if the second shot came before he drove off or after he drove off. In this case, there were shots fired after he drove off. But, again, we go back to your question, Justice Zinoff, that he could have, you said he could have backed up or he could have done something else. On the other direction. There was no other direction. Here's Central Street. Here's Sherman. On your side there is Sherman. They're facing this way. Here is the stop sign. They are stopped right here. If he were to continue straight, Foster is standing right here, so he would have continued shooting directly into the car. If he were to back up, Shooter could have turned around and shot face right into the front windshield and gotten both of Newbern and Maurice. If he backed up and turned around, Foster could have run after that direction. It would have been no different than what happened, because what happened, according to Spak and Tarsha Franklin, whose testimony also is a little questionable. Why is her testimony questionable? Why couldn't the jury believe her testimony? Tarsha lived in the house that was in northeast corner. She was in her bathroom. I think she said she was cleaning the bathroom. She was in the bathroom on the west side of the house. Excuse me. She heard the shots. She could have seen something, but her testimony was she could not see into the car. But then she said, and something that's irreconcilable is it looked like the driver was the shooter. And in that respect, the question arises whether or not Maurice really was the shooter. But you can't reconcile her testimony that she could not see in the car, yet now she claims he was the shooter. It just doesn't make sense. If you can't see in the car, you can't see in the car. Plus a person can see the flash from the muzzle of a gun. But the gun would have been aiming out the passenger window. She would not have been able to see the flash inside a car if the flash occurred inside the car. Were those questions asked? Not the flash. I don't believe that was asked of her. I don't remember that being asked. But there was a casing in the back seat. So, you know, that gun might not have been all the way out the window. I mean, it could have been shot from inside the car since there were casings mounted. That casing also could have been shot as they were turning the corner. Maurice turned the corner to, as he said, get out of the line of fire to protect his own hide. At that point, according to William Spack, who was in the house at the northwest corner, the pedestrian shooter, who was Foster, they both identified Foster as the shooter, the pedestrian shooter was following and shooting at the car. And at that point, the .45 is what shot out that back window. And, you know, as Ed Light, who was the defense attorney below, said, you have this maniac idiot in the front seat who continues to shoot. That does not mean Maurice is still responsible for his conduct. What about the allegation that he contacted the police? I'm sorry. I didn't hear you, sir. I believe there was an allegation that your client contacted the police after the shooting. Is that correct? Yes. What did he contact them about? I believe he wanted to turn himself in. That was the point of it. If it was five days later, I grant you that. But I believe it was that he wanted to turn himself in. And it's also worthy to note that Newbern was found in the 800 block of Oakley, which is only one block away from where the shooting occurred. Coincidentally, I believe it was Joyner's house that he was found in. But it was only one block away. And the state makes a big deal about how the defendant remained in the area. He did not remain in the area. He drove north to get out of the line of fire. He went around and he zoomed three blocks away. So he was at least four blocks away, sorry, three blocks away from where the shooting occurred. And then he called his brother to get the heck out of there. So he did not remain on the scene. He did not help Newbern in any way. Now, when Newbern got out of the car, that's not clear from the evidence. We don't know. Why don't we go to the facts? Okay. The trial proceeded on two charges, conspiracy and the activated discharge. There were, depending on where you read in the record and whose brief you read, there were either 27 or 29 veneer members who were chosen, selected for questioning. Ten of those were women. Three of the women were excused for cause. One was a pending litigation. One, I believe, was an injury or a medical situation. And one was, in the judge's terms, she was a nut. So nobody wanted her on the panel. There was one woman ultimately selected for the jury, Susan Person. And there was one woman, Carol Middleton, who was selected as the sole alternate. So the question of the Batson issue revolves around the five remaining women jurors, two of whom are black. Those jurors are Jillian Aragon, Debra James, Mary Kay Granz, Stacey Caton, and Laurel Lundy. Laurel Lundy was characterly challenged by the defense attorney because she made it abundantly clear she did not want to be there. She appeared to be coming up with every excuse possible to get off the jury. The prosecutor, she even included that she had a burglary to her home. She had a friend who was arrested on drug charges, I believe convicted also. Her grandmother was assaulted, and it would be an extreme hardship to serve. The prosecutor chose to keep her, but the defense attorney did parentally challenge her. Now, the reasons that she gave are important when you do the juror comparison to some of the other women jurors who were eliminated. The first one is Jillian Aragon. Aragon was Jamaican descent. She was either light-skinned, black, or mixed race. She had a relative, and again, it depends on which part of the record you're reading and whose brief you're reading, whether it was a brother or a cousin, but it was a relative who seven years prior to the trial was convicted of a third drug offense and was deported to Jamaica. She also did a courtroom observation, I believe, according to the state's brief. I don't recall this myself, but it was 12 years prior to the trial. She did a courtroom observation. But wasn't her description of what she viewed, wasn't that described as odd? The prosecutor described it as that, yes. That was the reason that the prosecutor used for when the Batson challenge came up. And also the referral to the fact that it was the state, capital S, that deported the relative. Weren't those two PFACs? They were two reasons given by the prosecutor, yes. We're saying that those reasons are pretextual because when you compare them to the other jurors, there were plenty of other jurors, men included, who had relatives who were both convicted of drug charges or DUIs or other charges. There was even one juror who was himself convicted in Michigan. So it doesn't make a difference whether it's the state deporting it or the state charging and convicting somebody. You have the state involvement. So if you're going to have some excuse saying that she's going to have a bias against the government, well, then why don't these men have a bias against the government? That doesn't make sense. The other one about the courtroom observation, this is a little off the record and I apologize. When I taught paralegal studies, I took classes to the King County Courthouse all the time to observe courts, to observe criminal trials. I even brought a class in here to observe this court in oral argument. And I believe Justice McClaren was there that day and spoke with the students. It is not at all unusual or odd to do any type of a courtroom observation. So that is a contextual reason as well. In terms of Kayton, we have she was the only, quote, unquote, obviously black juror there. She said in her voir dire that there was a theft from her garage that was left unreported. The prosecutor said that not calling the police after that theft was suspect, that it showed that she had a distrust of the system and a lack of concern. Pretextual for the following reason. If somebody steals a, I'm sorry, if a neighbor comes over to your house and borrows a screwdriver from your garage and forgets to return it, that's theft. Am I going to call the police? No. That's a waste of police officers' time to handle a theft of a screwdriver. On the other hand, who knows if what was stolen from her garage was a kilo of cocaine. We don't know. She's not going to report back to the police. So we have no clue why she didn't call the police. It has nothing to do with a distrust of the police or the system or anything else. It's just that it was not. Well, it might. But those questions weren't asked. All the more reason to send it back for a further hearing. Why does the trial court ruled on both of these jurors, correct? Yes. And what's the standard of review? Clearly erroneous. Sorry about that. Correct. Clearly erroneous, yes. And we are saying that the judge was, that his decision was clearly erroneous. I'm also going to add that the state has cited Davis 1 for the proposition that the standard of review is clearly erroneous. Under Davis 1, it was sent back because there was an insufficient Batson hearing. There were insufficient findings. Justice Zenuf just raised one of the questions that shows that there was an insufficient hearing here. There was not a finding. May I conclude? You can continue. Okay. The same thing with Deborah James. Deborah James, there was no reason given by the prosecution for eliminating her with a peremptory challenge. So there has to be a remand to address, if only Deborah James, there has to be a remand. What's your position relative to why women would apparently favor the defendant over men? Because that seems to be the underlying reason or rationale for why your client would be prejudiced. Because if they were antagonistic to your client, it would seem that he would not, therefore, be injured. So I think the inference is that these people, these women, would be more favorable to your client. So could you explain to me how they would be more favorable than men would be? Well, I think we go to what J.D.B. against Alabama stands for, that there is this uncalled-for stereotype concerning women, that your Honor just nailed it on the head, that there is this idea that women might be more sympathetic to the situation, which is why the prosecutor would want them off. That stereotype, unfortunately, still exists, that women are the motherly type. They're going to be more sympathetic. The trial court found that the defendant didn't make a prima facie showing of gender discrimination, so we never got to the real Batson issue, correct? I'm going to disagree with that, too, and I disagreed with that in the reply brief. I think there was a finding. It was ambiguous. I'll grant you that. There was clearly the finding of the prima facie case for the racial discrimination. But they continued on the discussion. Once they finished talking about Aragon and Caton, who were women, happened to be black, the defense attorney said, you know, I've also raised this on a gender discrimination, and the conversation continued, and it was at, if I may take two seconds here to pull this up, it was at page 254 of the record that the judge said, and I'm quoting from the record, and there were only, when you look at the first group of 12, there were actually, we didn't even call it 13, blah, blah, blah, and out of the three women up to that point, Aragon, who we have already talked about, indicating that the issue had already been discussed in terms of race and gender, I would argue, Lundy, you exercised the preempt addressing the defense attorney, and Deb James, and then he was cut off. The trial court was cut off by the prosecutor who said, yeah, but we have a woman on the jury, and we have a woman as the alternate. So there was no reason for Deb James, given for the preemptory challenge, but the judge, I think, was asking for that at that point. So I think there was a prime facie case made, and the judge was trying to continue with that, and was cut off by the prosecutor. Well, doesn't the defense attorney have an obligation to press then and say, judge, we're asking for a finding on that issue? He tried. He tried. Defense attorney went out and said it's the same as with the race, and he tried to argue that again, but the court said, I've made my record, the defendant is a male, that's a consideration that I had, and technically we shouldn't have been up to Cayton, and he goes on and says, it can be considered. You can look at it. Boom. And that's where it's left. Any other questions? Thank you.  You have an opportunity for the public. Thank you. May it please the court, counsel. I am Jay Hoffman of the Appellate Prosecutor's Office. It's my pleasure to represent the people of the state of Illinois before the Senate Open Court this morning. Taking the last question last, Your Honor, as I've argued in my brief and have set forth, no, the trial judge did not make a firm finding that there was no prima facie case here. However, it's very important to note that with regard to the first issue, that's an issue addressed, the matter of race, the trial judge did make a clear finding. He said, well, I find that there's a prima facie finding because the only obviously African American or black, I don't remember the term in this person, was struck, and he made that finding, and then specifically went on to ask the prosecutors for their reasons. Now, in the second issue, when they got to the second issue, the gender matter, he did not say, well, I find that there was a prima facie case made, and he did not press and go on even if he was interrupted. He didn't ask about, continue to ask about James. He didn't ask about Grants. My position is that there's no clear finding here and that because it's obvious that the judge understood the law, he understood the three-step analysis beginning with the prima facie case and did not go on with it, that his opinion was there was no prima facie case. And as we set forth in the brief, there are seven factors having to do with whether there was a prima facie case made, and all but I think one, maybe arguably two of those factors come out on the side of the state. The gender identity between the parties, where both of the state's attorneys and assistants in this case were women. The pattern of strikes. There was no pattern of strikes, as stated. There were nine people, two, nine or ten, two or three, depending upon how you read it. I think one was the same, were struck for cause of the other seven. Two either got on the jury or was an alternate. One was struck by the defendant, and therefore there were four out of the seven which were struck. Now, I don't see that that's a pattern. It's a little over half. The third question, the third issue, is the disproportionate use of parenteral challenges. Clearly here that cuts in favor of the defendant, since all four of those parenterally struck were women. But again, if you look at that, you have to look at the ratio that was there. It was heavily male. Seventeen of the ten were male. I'm sorry, twenty-seven of, seventeen of the twenty-seven jurors were male, so that only ten were women and only seven wound up being dealt with to getting on the jury. The level of female representation, again, that cuts somewhat in their case in the defendant's way because of the number of females, there was only one on the jury and one as an alternate. But again, that had to do with the disproportionate weight of males on there and the people that were struck both for cause and by the defendant. The fifth is the questions and statements of the challenging parties. I'm not going to go through them. If you read through, you'll see that the assistant state's attorneys were consistent in their concerns. One of the concerns was something which came up with Ms. Caton was, had you previously called, have you ever called the police or called the fire department? And indeed, Ms. Caton actually said that, yes, she had called the fire department at one point because of an injury that she saw. And yet when it came to the fact that someone had committed a theft in her garage, and there's absolutely no evidence that this was somebody borrowing something from her, and she used the term theft. She said there was a theft from my garage and did not call the police over that, unlike the person that the people selected or didn't strike. The sixth is whether the excluded female veneer persons were a heterogeneous group having only their gender in common. I've set that out in my brief. That's not true. They all have different factors. James had a child who had been convicted of drug possessions earlier. They're different races. They're different backgrounds. So those factors are simply not consistent. It's not a situation where the only thing about them is that they're women. And lastly, the gender of the defendant, the victim, and witnesses. Counsel says that this is not a factor. I disagree. It's right here. If you look at Davis Warren and Rivera from our Supreme Court, I admit that it's not necessary. In other words, the defendant here being a male can challenge the peremptory challenge of a woman. The defendant, if someone had challenged a white person being an African American, could have done that. That's what Batson says, that you don't have to have the same gender or race of the person being challenged in order to raise a claim. But with regard to the factors as to whether or not there was a prima facie case shown, that's one of the factors. Now, in another way, counsel says, well, you know, these factors don't make sense. Well, I cited a case for the fact that Batson does not go any farther than it goes. Batson says, and subsequent cases following Batson expanded the gender, but Batson says you can use bad strikes for race and for gender. However, any other reason is valid. If I want to challenge someone because they have a mole in their nose, that's my right. If I want to challenge someone because they're tall or bald or short, that's my right. What is your response to counsel's argument that the state's reasons with regard to the racial discrimination were pretextual? Is that your response? Well, no. My response is that they gave two, as the trial judge found, they gave neutral reasons. They gave two for Eroquin and they gave one for Kayden. And, again, I think it's valid to be concerned about whether a person trusts the police and trusts the system when they don't even bother to call when there's a theft from their house. And I would go farther and say that's accented by the fact that she showed in another circumstance she was not afraid to call the authorities in order to get the police there because someone had been injured. And with regard to Eroquin, as we've set out in the brief, the United States Supreme Court has said that being expelled from the country, being deported, is a very major factor, a very big thing, and there's no reason that the assistant attorney in this case couldn't feel that that might have been a factor entering into Ms. Eroquin's head, along with the fact, as Justice Zinoff pointed out, when she said that, well, you know, there was something funny about the way she mentioned when she had gone to the court before. Yes, it's not uncommon for people to go and sit and court watch. It's not uncommon for people to go as part of a class or perhaps even by themselves, although I would guess older, retired people would be more likely to do it. But that's not the point. The point here is the assistant state's attorney said there was something about the way she said it, and I've cited cases talking about the Batson analysis saying that the review of this court, whether you call it manifest weight or clearly erroneous, there's some mixing of the language. Let me ask you this question. What here in this case was done in open court in the presence of the other prospective jurors, correct? Correct, Your Honor. So when a prosecutor or defense attorney asks a question that causes them concern, your argument is that the prosecutor should not be required to press and ask for more information that might cause prejudice or a negative view of the prosecutor in the presence of the other prospective jurors, correct? Well, that's one factor, yes, Your Honor. And that's why trial courts traditionally and the appellate courts have, you look at a race-neutral explanation and if it's given and it's satisfactory on its face, you accept it, correct? That's correct, Your Honor, and the judge here found it. In addition, I mean, we don't know why. So what could be learned on remand as the defense suggests for further hearing? Is there anything else that could be learned? I guess is she asking for remand for an evidentiary hearing for them to further go through a Batson analysis? I would say with regard to the racial challenge, no. Now, I have said, I've said that at the very most, if this court disagrees with me and it finds that the trial judge found a per se, finds that the defendant made a per se showing of improper strikes, that it be sent back down to have questions about why James and Granz were struck, because there were no questions about that. And again, I think that indicates the judge found there was no prima facie finding, a showing rather. Counsel, on the sufficiency of the evidence issues, do you agree that Taylor is applicable here or is it distinguishable? And if so, how? No, I think Taylor is distinguishable in a couple of ways. First of all, my recollection is that both shots in Taylor were outside the car. There was this meeting at a corner, a very narrow street, and there were cars on both sides of the street, and the cars were coming to this corner and I guess had a near collision. The defendant at one point says that he backed up, and then it seems unclear if they pulled up next to the other car. There were allegations that the people not in the defendant's car made racial challenges or racial slows. The passenger then got out, and my recollection of it is, while he was on the street, shot twice at the other people, then got back into the car and then went away. I think the most important point here is that there was no further shooting or further turning, as there is in this case. There's also no indication, and I believe, as Your Honor noted earlier, that one can infer from the way they went around that, from the way the defendant here drove around the park and got to a circumstance where they parked here at the corner, so that if Mr. Newmore had the gun, he would have a clear shot down the street at Mr. Foster. The other, I think, very important thing, besides this driving around the block, besides driving up and then turning, instead of continue to flee, I mean, Foster certainly can't catch up with the car, and yet they don't continue to flee this way. Also, this business about, well, they wouldn't have gone straight on the street there. Well, he would have had the same shot there that he had going up through the back window. That's just a nonstarter. But getting back to your direct question, also the difference in Taylor is there is no indication at all. As a matter of fact, there's an indication they didn't know each other. So this isn't a case where there could have been any type of stalking. You could infer it. This was just a random haphazard meeting in a narrow corner. Our position is that there was sufficient evidence from which a rational jury could determine both that the defendant was guilty as the principal because Ms. Franklin did say that she believed it was the driver doing the shooting, and although three of the casings were found out on the street, two were in the curb, one was more out in the middle of the street, and we don't know what happened before the police got there, if they got kicked around, if they got hit in the car, or whatever. Another of them was in the back seat, or it would make sense, and there's no testimony, as I pointed out, from which side the bullets were ejected, the shells, casings, excuse me, are ejected. But in most automatic handguns, they're ejected from the right because most people are right-hand shooters, so you don't want them ejecting across the body. Now, we don't know that, but given that most of them are like that, it would make sense for, if the defendant was shooting, for it to go into the back seat, whereas if this is the edge of the car, if Mr. Newman were shooting, it's most likely his hand is going to be out like this and nothing's going in there. She says, well, he could have shot back. There's no indication they shot when they went back. He shot while they were there. They turned the corner, and then they turned again at the next corner. Went again. They could have gone straight, but they turned, and that's where all the shots were. Certainly, it's possible that the defendant could have, in driving the gun away, if he had been the shooter originally, tossed the gun down, and then Newman could have picked it up and continued shooting. But Ms. Franklin said that, oh, that's where I wanted to get to. Counsel says, and I address this in my brief, too. Counsel says, well, Ms. Franklin said she couldn't see in the car. That's not what she said. She was asking, she said, I couldn't see, I couldn't identify the people in the car, I couldn't see well enough to see how many people were in the car. But she said that she saw the shooter and believed it was the driver. She also said that the shooter was black. So she could see in the car, at least in a certain manner. She never said she could not absolutely see in the car. So our argument is basically, with regard to the reasonable voucher honors, that the jury could believe Ms. Franklin, who, of course, told the police on that day also that it was the driver who did the shooting. Counsel says, well, she couldn't see that the car turned. Well, houses are set back from the street. I don't think it's unreasonable to believe she could look out the window and see the car turn. Now, she couldn't see very long because of her neighboring houses, but she certainly could see it turn that corner. And her testimony is supported by the fact that the defendant testified he turned there and we found the other shell casings there. I mean, her testimony in that is clearly supported. There was some question about the police saying that one of the police saying, well, she said they went straight and then turned on Oakley. She denies that. She said, no, you misunderstood what I said. With regard to the accountability, again, it's our belief that while there was no direct testimony regarding, because no one was in the car but you, Warren, and the defendant, that they were looking for Mr. Foster and his ex-girlfriend, Ms. Joyner, one certainly could infer that they were because of the way they traveled around the corner. And I would say that this business about stopping at the basketball courts on Sherman on the northwest side of the park might also be supportive of that feeling because they're waiting for Joyner and Foster to get closer to the corner. And then again, they turned, did not flee. They turned on Arthur when more shots were fired. And then instead of continuing away from the area totally, where if they were concerned about being shot at, they would have, they doubled back and came down one block away from Central on Oakley. Now, if they're concerned about him chasing them and still firing at them, he certainly could have seen the car come down past Sherman on Oakley. They would have gotten out of there as quickly as they can and as far as they could. Any other questions? No. Thank you, sir. You're welcome. Thank you. Thank you. Yes. Let's start with the reason why. Mr. Hoffman distinguishes Taylor on one of the reasons distinguishing Taylor is that the fleeing afterwards, that in Taylor he was able to back up and get out of the area. Here, there was no, there were no people in Taylor shooting back at them at Hollingshead. So they could have the luxury of backing up and getting out of the area. In this case, you've got somebody who's shooting at you, and according to William Spack and Tarsha Franklin, is heading north on Central, chasing after the car. So no matter what direction that car went, Foster was going to chase him. So here you have Maurice driving north, trying to get away from Foster, who is shooting at them. Spack said he saw him shoot north on Central two shots, and at that point is probably when the rear window of the car got shot out. That's just my guess, but everybody seems to be speculating. So he ran. Foster continues to run north. What is Maurice going to do then? Turn around and go back down Central? No, he's going to turn away from the direction this person is running. He's going to turn over on Arthur, and then, like Ed Link said, the maniac idiot is going to shoot out the window again, which he did. And he could have very easily turned around and shot out the back window where the hole was in the windshield, and that left the casing on the back seat by the booster seat. And then they turn around and go the opposite direction from the crazy man who's chasing them shooting. That is fleeing, absolutely, but not in furtherance of Newbern's activity. That's fleeing to save your hide, as I said in the reply brief. Let's see. Let's switch over to the basking issue. Mr. Hoffman says that there was no firm finding about the prima facie case of the gender discrimination. That's true. There was also no firm finding that there was no prima facie case. There was no finding. That's part of the problem here. It's ambiguous, and I said before that I think it's reasonable to conclude that the judge found that there was a prima facie case because he did continue asking about the other women, not just the black women, who were concerned in the racial discrimination. Well, Justice Burkett, I think, asked previously, whose fault is it that there was never a definitive statement one way or the other? Well, isn't it the defense attorney required to get some clarification or enunciation? And as I answered before, yes, it is, and I believe Ed Light did try to get further clarification of it, and the judge sort of cut him off and said, this is my ruling, period. Well, has he been, therefore, ineffective counsel? No. I think there's only so much that you can push a judge, Your Honor, before it gets to be bordering on almost contempt. I don't know. For every action, there's an equal and opposite reaction. And if you push a judge, it tends to make you go in the opposite direction. So at least physically it's possible. You weren't talking about something in some other plane, were you? No. No. One of the other things that Mr. Hoffman said is that there was no pattern of strikes by the prosecutor. When you look at it, there were seven women. Two of them made it out of the jury. Five of the women were struck. One was by the defense attorney. One hundred percent of the peremptory challenges exercised by the prosecution were against women, two of whom happened to be black. To me, that's a pattern. So I think counsel's representation that there was no pattern is not exactly accurate. Also, in terms of Stacey Caton, counsel says there was only one reason given, and that was that there was the theft from her garage that was left unreported. There were two reasons. And the second reason was the prosecutor said to the judge, I didn't know she was the only black. That, in and of itself, under Hernandez, is not a race-neutral reason. That would imply that he's considering her race and hoping there's some other she rather than the prosecutor's woman. I'm sorry. Explain this again. If he doesn't know that she's black, then how could he be striking her because she is black?  It was not that she was a woman, wasn't it? Yes, but the prosecutor said, I didn't know she was the only black on the veneer, which implies that she was waiting for some other black, maybe a man. So that goes to the gender discrimination use of the peremptory challenges. Let me ask you the same question I asked State. Once a prosecutor elicits what he thinks is a reason why he wants to exercise a peremptory challenge, should a prosecutor or a defense attorney, for that matter, be required to ask anything else of a prospective juror if they're satisfied that they don't want this juror? I think what I'm trying to tell you is whether it's a defense attorney or a prosecutor, I mean, your argument is that the explanation that they gave, which is in the transcript, is not race neutral, even though it's supported by the transcript. Correct. What else is a prosecutor or a defense attorney if a balancing challenge is made against the defendant? What else is he required or she required to do? I think to be specific as to this case, in terms of Stacey Caton, for instance, one of the questions that could have been asked either by defense or the prosecution or the judge, the prosecutor said the judge did the follow-up questions as to the theft answer, which there was more follow-up questions, could have been, was it something that was major, taken from your garage? Do you understand the point? Apparently not. That if you run the risk, that you then run the risk of alienating other jurors. Regardless of what the subject matter is, if you're not comfortable with a prosecutor or with a prospective juror and you believe the record's going to establish that, and does a prosecutor have a crystal ball and at some point in time there's going to be a balancing challenge? He has to look at his or her notes and this is why I excluded that juror and give them, and then the trial court makes an assessment. Is he credible, correct? That's one of the determinations that the judge has to make at that third stage of the balancing process, yes. The judge made it with regard to race in this case. He found that it was a race-neutral reason, yes. Yes. We're saying that was an erroneous conclusion. Okay. Just as an aside, there are many times in reading transcripts, and Your Honors have faced it yourselves, that if there is an issue that comes up during voir dire that seems to be something that should be addressed at the bench, then it should be, so those further questions could conceivably have been asked at the bench, outside the hearing of the other jurors, so the other jurors would have contained it. We'll take the case under advisement. There's another case on the call. There will be a short recess. Thank you.